UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE HENDERSON,

          Plaintiff,                               Case No. 12-10277

v.                                           Paul D. Borman
                                           United States District Judge

CHRYSLER GROUP, LLC,

          Defendant.
_____/

OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 32)

      Plaintiff Katherine Henderson ("Plaintiff") filed her original complaint on January 20, 2012.  (Dkt. No. 1).  Thereafter, pursuant to a stipulation and order, Plaintiff filed the amended complaint on April 4, 2012.  (Dkt. No. 10).

      Now before the Court is Defendant Chrysler Group, LLC's ("Defendant") Motion for Summary Judgment, filed on June 28, 2013.  (Dkt. No. 32).  Plaintiff filed a response on July 31, 2013.  (Dkt. No. 34).  Plaintiff sought and received leave to file a response brief with excess pages.  (Dkt. Nos. 35, 36).  Defendant also sought and received leave to file a reply brief with excess pages.  (Dkt. Nos. 38, 39).  Defendant's reply brief was filed on August 26, 2013.  (Dkt. No. 37).  A hearing on this matter was held on February 21, 2014.

## I. BACKGROUND

### A.    Plaintiff's Work and Education History

      In 1989 or 1990, Plaintiff began taking classes part-time through Central Michigan University.  (Pl.'s Br., Ex. 1, Pl.'s Dep. at 13-14).  Plaintiff received her undergraduate degree in

December, 2011.  (*Id*.).

Plaintiff's career with Defendant began in 1986, when she was hired as a budget analyst in the Human Resources ("HR") department.  (Pl.'s Dep. at 59).  Since 1986, Plaintiff has held multiple different positions within Defendant's HR department.  Plaintiff's most recent position with Defendant was as a Talent Acquisition Placement Manager which she started in 2007.  (*Id*. at 91-92).  As a Talent Manager, Plaintiff was responsible for placing applicants into open positions within Defendant's internal departments (with these internal departments being referred to as "clients").  (*Id*. at 95).  Plaintiff served five internal departments: Purchasing and Supplier Quality, Powertrain and Engineering, Supply Chain Management and Corporate Quality.  (*Id*. at 98).

From 2009 until 2011, Plaintiff reported to supervisors Kathryn Lee, Lori Otis, Lisa Wicker, Michelle Cook, and finally, Joseph Delikat.  (Pl.'s Dep. at 96-97; Wicker Dep. at 13).  Delikat also worked with Plaintiff as a client for approximately three months in early 2010 before becoming her supervisor from March until May 2011.  (Delikat Dep. at 16, 30-31).

**B.     2008 and 2009 Medical Leaves**

On September 30, 2008, Plaintiff went on paid medical leave for a ruptured cyst in her knee.  (Pl.'s Dep. at 132-33).  She returned to work on December 10, 2008.  (*Id*. at 133).  Then on April 7, 2009, Plaintiff went on a paid medical leave to have a knee arthroscopy and surgical repair of her ACL.  (*Id*. at 133).  Plaintiff returned to work on August 16, 2009.  (*Id*.).  Plaintiff testified that neither of these medical leaves were leaves taken pursuant to the Family and Medical Leave Act.  (*Id*. at 182).

Lisa Wicker ("Wicker") was Plaintiff's supervisor in 2009 and testified that she

2

accommodated Plaintiff upon her return from leave by making sure that clients came to Plaintiff

so she did not have to leave her work space as often. (Wicker Dep. at 31). However, Plaintiff

testified that upon her return from her ACL surgery, Wicker treated her differently. (Pl.'s Dep.

at 133). Plaintiff claimed that Wicker began to "scrutinize" her vacation time, she was excluded

from certain staff meetings and that her workload was greater than her contemporaries. (*Id*. at

134-37).

**C.     Talent Acquisition Group Outsourced to The Right Thing**

         In 2010, Defendant began evaluating whether or not to outsource the Talent Acquisition

Group. (Wicker. Dep. at 21-22). This process included completing due diligence and financial

analyses of three different companies. (*Id*.). Eventually, Defendant decided to outsource the

Talent Acquisition Group to a company called "The Right Thing". (*Id*. at 21-23). The process

was to be completed by June, 2011. (*Id*.). Wicker testified that the entire department was aware

of this process through staff meetings and updates. (*Id*. at 23). Wicker also stated that

"[i]nitially, and at the end of the day, our plan was to redeploy each and everyone [in the Talent

Acquisition Group] that certainly had a desire to be redeployed." (*Id*. at 24:18-20).

         Plaintiff testified that she was aware in January 2011 or earlier that her department was

being outsourced to The Right Thing. (Pl.'s Dep. at 178). Plaintiff was also aware that

Defendant was hoping to accomplish outsourcing her entire department by June of 2011. (*Id*.).

Plaintiff further admitted that her job was not outsourced because of her disability or her age.

(*Id*. at 184-85).

**D.     Performance and Attendance Issues**

         From 2003 through 2007, Plaintiff received an overall performance rating of "excellent"

in her Performance reviews.  (Pl.'s Br., Ex. 2).  No reviews were given in 2008 because Defendant was in bankruptcy.

Wicker testified that as Defendant was coming out of bankruptcy in 2009 and 2010 the Talent Acquisition group was extremely busy attempting to hire and recruit candidates for a multitude of job postings.  (Wicker Dep. at 13-14).  After bankruptcy, it was decided that Defendant would hire anywhere from three to six thousand plus employees "until we got back up to speed."  (Wicker. Dep. at 14).  Plaintiff agreed that following the 2009 bankruptcy the demand for hiring among Plaintiff's in-house clients increased substantially.  (Pl.'s Dep. at 123; *accord* Def.'s Br., Ex. 27, DuBrava Dep. at 7:24-25, "Coming out of bankruptcy during that period, there was an enormous amount of hiring.").  Indeed, in 2010, Plaintiff asked Wicker for help with her workload and Wicker assigned two contract workers to help Plaintiff with her responsibilities.  (Pl.'s Dep. at 123).  Yet, Plaintiff testified that despite being provided this help, she was still overwhelmed with the responsibilities of her job.  (*Id*. at 127, 129).

Wicker testified that Plaintiff's attendance was an "on-going" concern of hers even prior to her becoming Plaintiff's supervisor in 2009.  (Wicker Dep. at 30, 43).  However, Wicker also stated that she does not recall ever determining that Plaintiff exceeded her vacation days or her sick days in 2010.  (Wicker Dep. at 32, 53, 55).  Delikat similarly testified that while he was her supervisor in 2011, Plaintiff's attendance was "sporadic" and there were times he did not know if she was at work or not.  (Delikat Dep. at 49-50).  Delikat also claimed that Plaintiff would often call and leave voice mails indicating that she was working from home.  (*Id*. at 84).

Wicker and Delikat both testified that in 2010 Plaintiff took excessive time off, worked from home without prior approval and failed have coworkers cover for her while she was out.

4

(Wicker Dep. 93, 101, 108-09; Delikat Dep. at 77-80; Def.'s Br., Ex. 9, Gravlin Decl. Ex. C, 3/29/10 Email chain, "This should be a prime example to Lisa why things can't wait till Kathy gets back nor can we stop while she is gone."; Gravlin Decl. Ex. D, 4/11/10 Email chain, "Lisa, Yes, I can use your help, Bob has been asking for weeks about these candidates ..."; Gravlin Decl. Ex. E, 7/2/10 Email chain, "But Kathy is out of the office which I find funny seeing she is suppose[d] to be covering for Ifran....").

Then in September 2010, Wicker had a discussion with Plaintiff regarding her vacation schedule for the summer (Plaintiff had scheduled almost every Monday and Friday off through the summer of 2010) and also Wicker's "disappointment" with Plaintiff's work performance. (Pl.'s Br., Ex. 8, 6/28/10 Email chain; Ex. 9, 9/9/10 Email chain).  In that September meeting, Wicker advised Plaintiff of her deficient performance, recognized that Plaintiff had been assigned contract workers to help her with her workload, and also inquired if something else was going on that was affecting her performance.  (Pl. Decl. ¶ 6; Wicker Dep. at 56; Pl.'s Br., Ex. 9, 9/9/10 Email chain).  Plaintiff testified that she alerted Wicker to the fact that she had was being tested for rheumatoid arthritis during that meeting.  (Pl. Decl. ¶ 6).  Wicker relayed (via email) the fact this meeting took place and the substance of the conversation to Dawn Williams in HR, noting that Plaintiff had alerted Wicker to some "personal items" and recommending that Dawn meet with Plaintiff and offer her leave pursuant to the Family and Medical Leave Act.  (Wicker Dep. at 56; Ex. 9, 9/9/10 Email chain).

Delikat also voiced concerns about Plaintiff's performance to Wicker when he worked with Plaintiff as a client in early 2010.  (Delikat Dep. at 30-31; Gravlin Decl. Ex. D, 4/11/10 Email chain).  However, he did not document any performance deficiencies by Plaintiff in that

5

time period and never completed a performance review for Plaintiff during the short time he was

her supervisor in 2011. (*Id*. at 31-33). Richard DuBrava, one of Plaintiff's internal customers,

testified that he had complaints regarding Plaintiff's performance during 2010. (DuBrava Dep.

at 9). DuBrava explained Plaintiff failed to return his emails or follow-up with his inquiries, and

when he would come to her office she was often not there, describing it as "very poor service."

(Dubrava Dep. at 9-10:4).

Plaintiff's performance review for 2011 (reviewing her performance in 2010) was

conducted by Wicker. (Wicker Dep. at 13, 65; Pl.'s Dep. at 130-31). Wicker testified that she

based her review on her observations of Plaintiff and also on information provided by Plaintiff's

internal clients and other supervisors. (*Id*.). Plaintiff's 2011 performance review was consistent

with Wicker, Delikat and DuBrava's testimony regarding her performance deficiencies and her

attendance problems, stating that Plaintiff's performance was deficient in certain areas, including

her timeliness and her follow-up with clients. (Gravlin Decl., Ex. B, 2011 Review, at 1). That

performance review also noted that Plaintiff's "customers' concerns were numerous due to lack

of her follow-up and commitment to get tasks accomplished when expected." (*Id*.). Further,

"[s]ome of the work that Kathy was to complete, was done so in spite of her in-actions." (*Id*. at

2).

**E.      2011 Absences, Medical Leave, Return and Lay-off**

In April 2011, Wicker became so concerned about Plaintiff's attendance she requested

her assistant forward her a record of all the time off that Plaintiff had taken in 2011. (Wicker

Dep. 44-46; Pl.'s Br., Ex. 13, 4/21/11 Email chain). This attendance record was forwarded again

between Wicker and Delikat and updated with new absences in May, 2011 after Plaintiff took

6

time off to care for her sick daughter.  (*See* Pl.'s Br., Ex. 15, 5/6/11 Email chain).  The 2011

attendance record notes that Plaintiff took one personal day and seven vacations days in

February, 2011; one sick day in March, 2011; three vacation days and one sick day in April,

2011[1]; and three sick days in May, 2011.  (*Id*.).

      Two of Plaintiff's absences in May 2011 were to care for her ill daughter.  (Pl. Decl. ¶ 7).

Plaintiff apprised Delikat of her absences and her daughter's illness and also provided him (per

his request) with documentation of the doctor's visit, treatment and lab order.  (*Id*., Ex. 5A; Pl.'s

Br., Ex. 16, 5/7/11 Email).  Upon receiving news from her assistant on May 6, 2011 that Plaintiff

was again absent, Wicker emailed Delikat stating "We should move forward as discussed asap.

Thank you."  (Pl.'s Br., Ex. 15).  Delikat responded to that email stating, in relevant part, "I

agree – we're on calendar early next week to discuss.  This is ridiculous.  My 6 mos old daughter

was sick on Sunday with double ear infection, dr on Monday with antibiotics, she's close to

100% now."  (*Id*.).  Wicker stated that the May 6, 2011 email was in regards to Plaintiff's

attendance issues and she planned to have a discussion about it with Delikat, and also about

"moving forward with a development plan for [Plaintiff]."  (Wicker Dep. at 50-51:9-10).  Delikat

testified that he made the unusual request of asking for documentation regarding Plaintiff's sick

leave in early May, 2011 because he had never "encountered other circumstances with

employees where absenteeism was to the extent of Kathy's."  (*Id*. at 159-60:7-10).

      On or about May 10, 2011, Wicker met with Delikat and either Jan Shock or Dawn

Pearce from HR to discuss Plaintiff and talk about putting Plaintiff on a performance

---

[1] The list also indicated that Plaintiff's status was unknown on April 21, 2011 however, the earlier email chain indicates that she was a late arrival that day.  (*See* Pl.'s Br., Ex. 13 4/21/11 Email chain).

improvement plan.  (Wicker Dep. at 62-64, 67).  In that meeting it was decided that Plaintiff would indeed be put on a performance improvement plan.  (*Id*.).  Plaintiff testified that, at that time, she was unaware that she was going to be put on a performance improvement plan.  (Pl.'s Dep. at 152-53).

Meanwhile, that same day, Plaintiff met with her doctor who recommended that she immediately start on a biologic medicine to bring her rheumatoid arthritis into remission and was advised she should not work.  (Pl.'s Dep. at 153-54).  Plaintiff testified that she called Delikat that same night and let him know of her diagnosis and the fact she would be on an extended medical leave for one month effective May 11, 2011.  (Pl.'s Dep. at 154-56).  Delikat claimed that he has no memory of Plaintiff calling him or telling him of her diagnosis, however, he later clarified that Plaintiff did notify him by phone that she was going on medical leave.  (Delikat Dep. at 94, 96).  On May 11, 2011, Plaintiff sent an email to the rest of her department notifying them that she would be out for an extended period of time and unilaterally declaring that Nora Town would be taking over her responsibilities in her absence.  (Pl.'s Br., Ex. 17, 5/11/11 Email).

On June 1, 2011, Plaintiff's position was officially outsourced to The Right Thing.  (Pl.'s Dep. at 225; Gravlin Decl. Ex. I, Executive Summary).  On June 13, 2011, Plaintiff sent Delikat another email stating that her doctor wanted her to extend her medical leave for another month.  (Pl.'s Br., Ex. 18, 6/18/11 Email chain).  This email also specifically mentioned the fact that she had rheumatoid arthritis and was treating with a Rheumatologist.  (*Id*.).

Plaintiff returned to work on June 28, 2011 and was placed on paid administrative leave effective June 29, 2011 because her position no longer existed.  (Pl.'s Dep. at 178, 224-25).  At

that time, Plaintiff's internal access to Defendant's computer system was taken away, which had the effect of depriving her of the ability to personally apply for internally posted positions. (*Id*. at 238, 243). Plaintiff was also informed upon her return that her medical leave was "no longer approved". (Pl.'s Dep. at 177). Because of this news, Plaintiff requested the paperwork for FMLA leave if "it wasn't already in the works." (*Id*.). Thereafter, Plaintiff completed the forms but never returned them to Defendant. (*Id*. at 178-79).

On August 8, 2011, Plaintiff was notified by a phone call from Jan Shock in Human Resources that she was laid off. (Pl.'s Dep. at 225).

## F.     Job Search

Plaintiff was aware, not only, that her job was being outsourced to The Right Thing in June, 2011, but also that she was responsible for securing another position with Defendant. (Pl.'s Dep. at 185-86). To this end, Plaintiff discussed a possible job opportunity with Lisa Giese as a Human Resource Generalist before going on medical leave. (Giese Dep. at 14-17). Plaintiff was informed of this opportunity by Wicker and Giese. (Pl.'s Dep. at 190). However, Giese testified that while she and Plaintiff had a conversation regarding the position, Plaintiff indicated that the high stress nature of the job might not be a good fit for her health. (*Id*. at 17). Giese then advised Plaintiff of a different position through Rick Munson that might "suit her skill set better." (*Id*. at 15). Plaintiff testified that she spoke with Rick Munson regarding that opportunity but he was never approved to hire additional resources for the position. (Pl.'s Dep. at 202-03).

Plaintiff testified that when she returned from her medical leave on June 28, 2011, she was informed that the HR Generalist position she had previously discussed with Giese was still

open.  (*Id*. at 194-95).  However, Defendant's records indicate that the position was filled by

Jodiene Weed, an external candidate, on June 22, 2011, some six days prior to Plaintiff's return.

(Giese Dep. at 33; Gravlin Decl. Ex. H, 6/22/11 Job Offer to Jodiene Weed).

Plaintiff did not specifically ask or express interest in any other position before going on

medical leave in May, 2011.  (Pl.'s Dep. at 204).  Plaintiff also did not apply for any internal or

externally posted jobs with Defendant while on medical leave. (Pl.'s Dep. at 224).  Upon her

return from medical leave, Plaintiff testified that she could not apply for jobs internally because

she did not have access to the system.  (Pl.'s Dep. at 238, 243).  Between July and September

2011, Plaintiff emailed Jan Shock and Walt Bartels in HR indicating her interest in certain

internally and externally posted positions.  (*Id*. at 238).

On August 8, 2011, when Plaintiff was laid off, she was also notified she would no

longer have the ability to apply for internally posted positions and that Defendant's HR

department would no longer be "granting [her] any preferential treatment" or allowing her to

utilize its services.  (Pl.'s Br. Ex. 20, 10/5/11 Letter).

After being laid off, Plaintiff applied for approximately 100 positions posted externally

on Defendant's website, www.Chryslercareers.com.  (*See* Def.'s Br., App'x A).  Plaintiff was

rejected for almost all of these positions pursuant to the resume review and telephonic process

which was conducted by The Right Thing.  (*Id*.).  Notably, Plaintiff did not secure a bachelor's

degree until December of 2011, which was almost always a basic requirement for the job

postings to which Plaintiff applied.  (*Id*.).

There is no dispute that Defendant did not screen its own external applicants during this

time period.  Indeed, after the Talent Acquisition Group was outsourced, The Right Thing

10

undertook multiple levels of review before any of Defendant's personnel would be involved with

an external applicant's interview process. (Def.'s Br., Ex. 19, Riley Dep. at 10). First, The

Right Thing would screen the applicants for the qualifications provided in the job description

and determine whether to move the applicant to the next level - the telephone interview. (*Id.* at

10-11). After the telephone interview, The Right Thing would pick the most qualified

candidates and send those to Defendant. (*Id.* at 11-12). Once the Defendant received the slate of

candidates, the Defendant's hiring manager would decide which people to interview. (*Id.* at 15).

If Defendant decided to make an offer, The Right Thing would generate an offer letter. (*Id.* at

16).

**G.     Model Planner Position**

In November 2011, Plaintiff applied for a "Model Planner" position with Defendant in

Christina Siko and Michael St. Pierre's Engineering Research and Development group.[2]

Eventually she was chosen for an interview with St. Pierre on December 5, 2011. (Pl.'s Dep. at

51-52). St. Pierre testified that on or about December 7, 2011 he decided to place Plaintiff in the

"offer pool" and start the process to make her an offer for the position. (St. Pierre Dep. at 28;

Pl.'s Br., Ex. 24, 12/6/11 Email chain). St. Pierre also notified Greg Franson with HR of his

decision. (St. Pierre Dep. at 28). St. Pierre explained that his only involvement in the hiring

process was to select the person for the position, he did not determine pay, benefits or formally

extend the offer. (*Id.* at 32).

Plaintiff testified that sometime after her interview with St. Pierre she was notified by an

_____

[2] The position Plaintiff applied for was specifically a Predictive Engineering Research &
Design/Architecture Model Planner. (Pl.'s Br., Ex. 23, St. Pierre Dep. at 26).

11

employee of The Right Thing, Tom Riley, that she had been selected for the position and that an offer was coming.  (Pl.'s Dep. at 288, 292).

Franson testified that after learning of St. Pierre's decision he determined that Plaintiff was a previous employee and he went to speak with her previous manager, Delikat.  (Franson Dep. at 22-24).  Franson spoke with Delikat for approximately 15 or 20 minutes and learned Plaintiff had been previously laid off and that she had "behavioral issues that he felt would resurface if we were to place her in a position here and with that that ended the conversation." (*Id*. at 25-26:8-11).  Franson explained the term "behavioral issues" further, testifying that Delikat had stated Plaintiff had "behavioral issues, things like attendance, inconsistent performance related to that".  (*Id*. at 26, 28).

On December 16, 2011, Franson contacted St. Pierre regarding the information he had received from Delikat.  (*Id*. at 27; St. Pierre Dep. at 34).  Franson advised St. Pierre that he had learned she did not get her jobs done, was often working from home and that he would not recommend making Plaintiff an offer.  (Franson Dep. at 27; St. Pierre Dep. at 34-35).  Immediately following this conversation with Franson, St. Pierre emailed Tom Riley and indicated that after a background check on Plaintiff, it had been discovered that "that [Plaintiff] has some behavior issues as well as consistently wanting to work from home and having her assignments not get done when needed."  (St. Pierre Dep. at 36-37, Pl.'s Br., Ex. 26, 12/16/11 Email).  St. Pierre's email indicated that he no longer wanted Plaintiff to be in the offer pool for the decision.  Riley responded to St. Pierre stating that he would speak to Plaintiff regarding the decision but that he "just want[ed] to be careful on how I communicate the information."  (Pl.'s Br. Ex. 27, 12/19/11 Email).

12

Plaintiff was advised by Riley on or about December 19, 2011 that the offer was "pulled". (Riley Dep. 53-54; Pl.'s Dep. at 298). On or about December 19, 2011, Kim Topping, a former supervisor of Plaintiff's and also a supervisor in HR, contacted Franson concerned that Plaintiff was no longer selected for the Model Planner position and also concerned that she had been told Franson had personally "blocked" the job offer. (Pl.'s Br., Ex. 27, 12/19/11 Email chain). Topping also stated that she was concerned "a case is being built." (*Id.*). Franson replied to Topping's email stating that prior making an offer he had "an offline discussion with J. Delikat" and that he had stated that Plaintiff was "laid off because of attendance issues, and work assignments being dropped and not completed." (*Id.*).

In January 2012, Plaintiff filed a charge of discrimination with EEOC. Thereafter, Franson was sent a request for information regarding Plaintiff's EEOC allegations. (Pl.'s Br., Ex. 29, 1/24/11 Email). In an email, Franson explained his involvement with Plaintiff's application for the Model Planner position but stated that no one within Defendant had ever offered Plaintiff the position and that after discussing her candidacy with St. Pierre and Christina Siko, "it was determined that based on a lack of technical engineering experience she was not offered the position." (*Id.*). However, St. Pierre testified that "but for" the conversation with Franson regarding Plaintiff's inability to get her work done, her frequent working from home, and her "behavioral issues" he would not have pulled her from the offer pool. (St. Pierre Dep. at 37-39).

After receiving her right to sue letter from the EEOC, Plaintiff filed this action.

## II. STANDARD OF REVIEW

Defendant has moved for summary judgment under Rule 56(c) of the Federal Rules of

Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material"  for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."   *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

14

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

Plaintiff sets forth five claims in her amended complaint: (1) violations of the Family and Medical Leave Act, 29 USC § 2611, *et seq.* ("FMLA"); (2) a violation of Michigan's Person' with Disability Civil Rights Act, MICH. COMP. LAWS § 37.1101, *et seq.* ("PWDCRA"); (3) a violation of the Elliott-Larsen Civil Rights Act (age discrimination), MICH. COMP. LAWS § 37.2101, *et seq.*; (4) a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 629 *et seq.*, ("ADEA") and (5) a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").

The Court of Appeals for the Sixth Circuit has made clear that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Therefore, as an initial matter, the Court recognizes that Plaintiff failed to address or

15

respond to any argument regarding her asserted age discrimination claims in her briefing or at oral argument.   Accordingly, the Court considers Plaintiff's claims of age discrimination pursuant to the ADEA or Michigan's Elliott-Larsen Civil Rights Act to be abandoned and will not address those claims.  Further, the Court recognizes that Plaintiff did not respond in her briefing or address at oral argument any FMLA, ADA or PWDCRA claims in regards to Plaintiff's application to 100 plus positions with Defendant between approximately August 2011 and December 2011 that were handled by The Right Thing.  Similarly, Plaintiff did not address any arguments regarding possible claims she may have been asserting regarding the HR generalist position that was filled by Jodiene Weed in June 2011.  Therefore, the Court will not consider these claims or claims that could be based on these facts as abandoned and not address them.

A.      **Plaintiff's FMLA Claim Asserted for the First Time in her Response Brief**

Plaintiff asserts for the first time in her response brief that her FMLA claim is also predicated on the time she took off in May, 2011 to care for her sick child.  In its reply brief, Defendant argues that any FMLA claim based on allegations other than Plaintiff's medical leave for her rheumatoid arthritis are improperly raised for the first time in her response brief and must therefore be rejected by the Court.

The Sixth Circuit has explained that a "court's evaluation of the scope of [a plaintiff's] claims amounts to a decision of the sufficiency of a pleading" and a notice inquiry "necessarily proceeds on a case by case basis."  *Carter v. Ford Motor Co.*, 561 F.3d 562, 566, 568 (6th Cir. 2009).  The key issue in evaluating a challenge to the sufficiency of a pleading is the issue of notice.  *Id*. at 566.  However, it is also clear that pursuant to FED. R. CIV. P. 56(c) a court must consider all the pleadings, depositions, affidavits and admissions on file in order to determine

16

whether summary judgment is appropriate. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Similar to the present case, in *Carter*, the plaintiff first asserted in her response to summary judgment that her FMLA claim was based on her 2005 termination and probationary reinstatement rather than her termination in 2006. *Id*. at 564. That district court declined to reach the newly asserted claim stating that events from 2005 were not part of her complaint. *Id*. at 565. On appeal, the Sixth Circuit found that the plaintiff's complaint was ambiguous as to whether it encompassed her new 2005 claim and observed: "[n]otably, besides her 2001 start date, the complaint does not tie its allegations to any particular date or event." *Id*. at 566. The Sixth Circuit then examined the plaintiff's deposition testimony in which she disavowed that the events of 2005 formed a part of her complaint and noted that "what Carter said at her deposition is evidence of the notice (or in this case lack of notice) that Ford had about the ground on which Carter's complaint rested." *Id*. at 567. Finally, the Sixth Circuit noted that the plaintiff could have amended her deposition answers pursuant to FED. R. CIV. P. 30(e)(1)(B) or amended her complaint, but had done neither. *Id*. Ultimately in *Carter*, the Sixth Circuit found that although the plaintiff's ambiguous complaint might have been construed as encompassing the events of 2005 because it was not limited to certain dates, her deposition testimony "expressly notified Ford that her claim focused on a separate event – the 2006 request for medical leave. Because the issue is fair notice, in this case, Carter's attempt to revive or resurrect her 2005 claim at summary judgment was too little too late." *Id*.

In *Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005), the decision the Defendant relies upon, the plaintiff asserted a claim of promissory estoppel for the first time in her opposition to a motion for summary judgment. *Id*.,

407 F.3d at 787.  The district court granted summary judgment and refused to consider the

plaintiff's claim because she had failed to raise the claim in her pleadings.  *Id*.  The Sixth Circuit

affirmed this decision, holding that "a non-moving party plaintiff may not raise a new legal

claim for the first time in response to the opposing party's summary judgment motion."  *Id*. at

788; *see also Kuns v. Ford Motor Co.*, 543 F. App'x 572, 577 (6th Cir. 2013) (relying on same

and declining to reach a claim that was first asserted in a response to a summary judgment

motion and not included in a subsequent amended complaint).  Specifically, the Sixth Circuit

noted in *Tucker* that "liberal notice-pleading requirements" do not apply when a new claim is

asserted at the summary judgment stage of litigation rather than in a motion to dismiss.  The

Sixth Circuit explained:

> This difference in timing is crucial.  A motion to dismiss typically occurs early in
> the course of litigation, well before discovery has been completed.  In contrast, a
> motion for summary judgment may not be granted until a plaintiff has had an
> opportunity for discovery.  And if a plaintiff decides to advance a new claim as a
> result of such discovery, liberal amendment of the complaint is provided for by
> Rule 15(a) of the Federal Rules of Civil Procedure which states that leave to
> amend the complaint shall be freely given when justice so requires.

*Id*. at 787-88 (internal quotations and citations omitted).  The Sixth Circuit further explained that

the Federal Rules provide for such liberal notice pleadings because "'[t]he provisions for

discovery are so flexible' that, by the time a case is ready for summary judgment, 'the gravamen

of the dispute [has been] brought frankly into the open for inspection by the court.'"  *Id*. at 788

(citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)).  However, once an action

has reached summary judgment, those "liberal pleading standards" are no longer applicable.  *Id*.

In *Carter*, the Sixth Circuit noted that ambiguity in the complaint might have been a basis

to argue the defendant had fair notice of a new claim.  In the instant case however, Plaintiff's

amended complaint is explicit in its recitation of dates regarding the predicate acts for her FMLA

18

claim.  For example, Plaintiff's amended complaint states:

> In or about 2010, Plaintiff was diagnosed with rheumatoid arthritis ("disability"). (¶10).
>
> On or about May 12, 2011, Plaintiff went on an approved medical leave and/or FMLA leave of absence due to health conditions related to her disability.  (¶ 18).
>
> On June 29, 2011, Defendant informed Plaintiff that she was eligible for FMLA leave due to her serious health concern. (¶ 24)
>
> On August 8, 2011, Defendant informed Plaintiff that her position was eliminated and she was laid off. (¶ 26).
>
> Defendant terminated Plaintiff's employment, and/or selected her for termination, because of her FMLA leave, disability or perceived disability, and/or age. (¶ 28)
>
> Defendant retaliated against Plaintiff and/or refused to re-hire her and/or place her in a position for which she was qualified because of her FMLA leave, disability, perceived disability, and/or age. (¶ 37).

Under her claim for FMLA, Plaintiff specifically alleges:

> Plaintiff suffered a health condition that required her to take reasonable medical leave of absence.  (¶ 44).
>
> Plaintiff, at all relevant times, was entitled to a medical leave under the FMLA and engaged in activity protected under the FMLA. (¶ 50).

(Dkt. No. 10, Am. Compl.).  These allegations unambiguously tie Plaintiff's FMLA claim to her alleged medical leave of absence due to her rheumatoid arthritis.  There is nothing in the common allegations (or the FMLA specific allegations) that could be construed as putting Defendant on notice that Plaintiff's claims would be predicated on a three day leave in early May, 2011 to care for her sick child.

In both *Tucker* and *Carter*, the Sixth Circuit noted that the plaintiff failed to move to amend their complaints once they determined that the face of their claims had changed.  *Tucker*, 407 F.3d at 788; *Carter*, 561 F.3d at 568.  In the instant case, Plaintiff similarly failed to move to

19

amend her amended complaint to reflect the new allegations. Plaintiff also failed to address any of her oral argument on the issue of whether this newly asserted claim is preserved and also failed to make any oral argument regarding an FMLA claim based on Plaintiff's absences to care for her sick child. Because Plaintiff has failed to further address this issue, failed to amend her response, and her amended complaint unambiguously states that her FMLA claim based on her medical leave due to rheumatoid arthritis, the Court declines to address a possible FMLA claim predicated on Plaintiff's absences to care for her sick child in early May, 2011.

**B.   FMLA Claims**

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq*, ("FMLA") entitles eligible employees to up to 12 weeks of leave per year for certain reasons, "including 'a serious health condition that makes the employee unable to perform the functions' of his or her position." *Tillman v. Ohio Bell Tele. Co.*, 545 F. App'x 340, 348 (6th Cir. 2013) (quoting 29 U.S.C. § 2612(a)(1)(D)). A "serious health condition" is defined by the statute as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility or (B) continuing treatment by a health care provider." 29 U.S.C. § 2613(a). An employer may require that an employee's request for FMLA leave is supported by "a certification" from her health care provider. 29 U.S.C. § 2613(a). However, when an employer requires such a medical certification, the employer must inform the employee "of the anticipated consequences of [the] employee's failure to provide adequate certification." 29 C.F.R. § 825.305(d).

It is unlawful for an employer to interfere with the rights provided to employees pursuant to the FMLA or retaliate against employees for exercising those same rights. 29 U.S.C. § 2615(a). "Upon returning from FMLA leave, an employee must be reinstated to his position or

20

an equivalent position in terms of pay, benefits, and other conditions of employment." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th Cir. 2012) (citing 28 U.S.C. § 2614(a)(1). The Sixth Circuit recognizes two separate theories for recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising under 29 U.S.C. § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)." *Tillman*, 545 F. App'x at 348 (citing *Seeger*, 681 F.3d at 282 (6th Cir. 2012)).

In the instant case, Plaintiff has alleged violations of FMLA based on both the retaliation and interference theories.

### 1.     Failure to Return Required Paperwork

Defendant first argues that Plaintiff's FMLA claims fail because she never returned Defendant's FMLA required paperwork.

There is no dispute that Plaintiff was informed on June 29, 2011 that she was no longer approved for paid medical leave for her rheumatoid arthritis. (Pl. Dep. at 176-77). Plaintiff testified that she thought at that time she was eligible for FMLA leave and requested on June 29, 2011, for HR "to just send me the necessary paperwork if it wasn't already in the works." (Pl.'s Dep. at 177:8-10; *see also* Pl.'s Dep. Ex. 24, 6/24/11 Email chain requesting FMLA paperwork). That same day, in response to her request, Plaintiff received all of the forms required to initiate FMLA leave from Jan Shock. (*Id*. at 178:20-24). Plaintiff testified that she completed the forms, however, at no time did Plaintiff ever return any of the completed paperwork to Defendant. (*Id*. 179:8-10, 182).

The paperwork sent by Defendant to Plaintiff to initiate FMLA included the standard forms from the U.S. Department of Labor for medical certification which stated "If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections, 29

21

U.S.C. §§ 2613, 2614(c)(3).  Failure to provide a complete and sufficient medical certification

may result in a denial of FMLA request. 20 C.F.R. § 825.313.”  (Pl.'s Dep. Ex. 24 at *4, U.S.

Dept Labor Forms).  Defendant's own FMLA policy also provided that:

> Failure of an employee to provide the requested certification, an incomplete or
> unclear certification, or to provide requested completion or clarification, or any
> other lawfully required form, may result in delay or denial of FMLA leave and/or
> denial of any pay ... which the employee might otherwise be eligible during the
> FMLA leave.  Failure to timely return the requested forms and any clarifications
> or completions can result in absences not being protected by the FMLA and
> otherwise subject to discipline, up to and including discharge.

(Gravlin Decl. Ex. R, Chrysler FMLA Policy at *4).

It is unclear from the briefing and argument the scope of Defendant's argument regarding

Plaintiff's failure to complete the FMLA certification documentation.  The documents

themselves indicate (as filled out by Defendant) that the FMLA leave Plaintiff was attempting to

initiate would have begun on June 30, 2011 after her paid medical leave from May 2011 through

June 2011.  (Pl.'s Dep. Ex. 24 at *2, U.S. Dept. Labor Forms).  Therefore, the Court construes

Defendant's argument to be that any claim by Plaintiff that she was entitled to FMLA leave after

her return to work in June 2011 is foreclosed by her failure to return the necessary

documentation as requested by Defendant.[3]  Plaintiff does not directly address this argument but

rather contends generally that Plaintiff gave sufficient notice to Defendant regarding her

intention to take FMLA leave.

To establish a *prima facie* case of a FMLA entitlement claim, a plaintiff must show:

(1) she was an eligible employee; (2) the defendant was an employer as defined

---

[3] To the extent Defendant argues that Plaintiff cannot establish a retaliation claim under
FMLA based on her request for FMLA forms on June 29, 2011, the Court addresses Plaintiff's
retaliation claim predicated on either her request for FMLA leave or her paid medical leave,
*supra*.

22

under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; (5) the employer denied the employee FMLA benefits to which she was entitled.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).

First, the Court notes that Plaintiff appears to misapprehend the argument. Here, Defendant argues that Plaintiff cannot set forth a *prima facie* case of entitlement because she cannot establish the third prong and show she was actually entitled to FMLA leave (as she never fulfilled the requirements to receive FMLA leave). Plaintiff appears to argue that she can establish a *prima facie* case because she can establish the fourth prong, that she gave Defendant adequate notice and fails to address whether she was actually *entitled* to the leave.

The present case is similar to *Willis v. Legal Aid Defender Assn., Inc*., No. 11-11384, 2012 WL 246293 (E.D. Mich. Jan. 26, 2012). In *Willis*, an employer requested that the plaintiff supply a "certification issued by the health care provider of the eligible employee" as provided by the statute, 26 U.S.C. § 2613(a). *Id*. at *6-7. However, the employee submitted a certification that lacked the requisite doctor's signature. *Id*. at 3. Based on the employee's incomplete certification, the employer denied the FMLA leave request and discharged the employee finding that she was on unauthorized leave. *Id*. at *2-4. The *Willis* court concluded that summary judgment was appropriate on the employer's FMLA entitlement claim because the employee could not establish she was entitled to FMLA leave when she failed to submit a valid certification. *Id*.; *see also Novak v. MetroHealth Med. Ctr*., 503 F.3d 572, 580 (6th Cir. 2007) (finding a plaintiff's return of insufficient and deficient medical certifications was fatal to her entitlement claim pursuant to FMLA).

In the instant case, Plaintiff failed to return the requested FMLA certification forms. The

23

regulations provide that "in most cases an employer should require that an employee furnish

certification at the time the employee gives notice of the need for leave or within five business

days thereafter, or in the case of unforeseen leave, within five business days after the leave

commences."  29 C.F.R. § 825.305(b); *see also* 29 U.S.C. § 2613(a).  Most critically, the

regulations provide that an employer can deny FMLA leave if an employee fails to submit the

proper certification and "if the employee never produces the certification the leave is not FMLA

leave."  29 C.F.R. § 825.313(b) (emphasis added).  Therefore, just as the Court in *Willis* found

summary judgment was appropriate when the certification forms were incomplete, here the

deficiency is even more obvious.  Plaintiff simply never returned any of the requested forms.

Thus, under the regulations the leave requested "is not FMLA leave" and any claim by Plaintiff

that she was entitled to FMLA leave on or after June 29, 2011 is without merit.

> ## 2.     Prima Facie Case for FMLA (Entitlement Theory Claim)

Plaintiff also appears to assert an FMLA entitlement claim based on her paid medical

leave from May 2011 through June 2011.  Assuming that Plaintiff's 2011 paid medical leave was

for an FMLA qualifying condition, Plaintiff's entitlement claim still fails on its merits.  As set

forth previously, to establish a *prima facie* case of FMLA interference, Plaintiff must show:

> (1) she was an eligible employee; (2) the defendant was an employer as defined
> under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the
> employee gave the employer notice of her intention to take leave; (5) the
> employer denied the employee FMLA benefits to which she was entitled.

*Donald*, 667 F.3d at 761 (quoting *Killian*, 454 F.3d at 556).

Further, to set forth an entitlement claim under FMLA, Plaintiff must show that she was

denied a benefit pursuant to FMLA.  To this end, Plaintiff merely claims that "she should have at

least been treated as a normal Chrysler internal candidate for hiring purposes.  And clearly,

24

Delikat should not have torpedoes [sic] Plaintiff's opportunity in December 2011." (Pl.'s Br. at 19-20). This is not enough to set forth a viable claim. To review, Plaintiff knew in January 2011 that her entire department was to be outsourced on or by June 2011. Further, Plaintiff admits that the "primary responsibility" for finding another job after the department was outsourced was hers. (Pl.'s Dep. at 185-86). Plaintiff took paid medical leave from May 2011 until June 2011 and returned to work to find (to no one's great surprise) her job had been outsourced right on schedule. Plaintiff was then placed on paid administrative leave and then eventually laid off in August 2011 after failing to find another position with Defendant. Plaintiff candidly admitted that her lay off was not attributable to her age or her disability. Likewise, Plaintiff cannot claim that she was denied FMLA leave or reinstatement due to her medical leave because the decision to outsource her position was made prior to her taking medical leave.

To the extent Plaintiff vaguely claims she was entitled under the FMLA to be treated as an employee of Defendant while applying for positions after her position was outsourced, Plaintiff has failed to set forth any case law or reasoned analysis of how that can be considered a benefit accruing under the FMLA. The Sixth Circuit has recognized that "an employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." *Hoge v. Honda of Amer. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004) (quoting 29 C.F.R. § 825.216(a)). "Similarly, the right to non-interference with medical leave also is not absolute. '[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)). Plaintiff has

failed to show that pursuant to the FMLA, Defendant was required to treat her as an employee after her position was validly outsourced for the purpose of applying to other positions. Indeed, had Plaintiff been continuously employed by Defendant there is nothing to indicate that she would have been put on paid administrative leave when her position was outsourced to allow her extra time to look for a position prior to her lay off. Therefore, Plaintiff cannot argue that her failure to find employment with Defendant (or her inability to log in to Defendant's internal system) prior to her lay off or after was an "entitlement" pursuant to FMLA that she was denied.

Accordingly, even assuming Plaintiff's paid medical leave from May until June 2011 was for an FMLA qualifying condition, Plaintiff's entitlement claim fails on its merits.

### 3. Prima Facie case of FMLA Retaliation

Next, Plaintiff asserts that Defendant retaliated against her for taking or requesting FMLA leave. The FMLA provides that an employer cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Further, an employer cannot "use the taking of FMLA leave as a negative factor in employment actions." *Arban*, 345 F.3d at 403 (citing 29 C.F.R. § 825.220(c)). As explained previously, to establish such a *prima facie* case, Plaintiff must show: (1) the employee was engaged in an activity protected by the FMLA; (2) the employer knew that the employee was exercising her right under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald*, 667 F.3d at 761 (citation omitted).

Where a plaintiff relies upon indirect evidence, the court must evaluate the claim under the *McDonnell Douglas* burden-shifting framework. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501,

26

508 (6th Cir. 2006).  After a plaintiff has established a *prima facie* FMLA retaliation claim then the burden of proof shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If a legitimate reason is proffered by the employer then the burden shifts back to the plaintiff to demonstrate pretext.  *Seeger*, 681 F.3d at 285.  A plaintiff can demonstrate pretext by establishing that the reason proffered by the employer (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action.  *Id.*

Plaintiff claims she has presented a *prima facie* case of retaliation based on the fact that she was engaged in protected activity when she notified Delikat of her rheumatoid arthritis diagnosis and the fact she was taking a one month leave to seek treatment for her condition.[4] (Pl.'s Dep. at 154-56; Pl.'s Br. 18-19).  Plaintiff argues that Delikat used those absences as a reason to give her a negative reference six months later and "torpedo" her chance at the Model Planner position by telling Franson (who told St. Pierre) she had "behavior issues" and claiming that she always wanted to work at home.

Inherent in this argument is Plaintiff's attempt to establish the second prong of the *prima facie* case – knowledge – by attributing Delikat's knowledge of Plaintiff's paid medical leave and her diagnosis (through his negative reference to Franson) to St. Pierre.  It is undisputed that St. Pierre was the sole decisionmaker regarding the Model Planner position and he was unaware of Plaintiff's medical issues, her age, and any medical leave that she previously took while employed with Defendant.  (St. Pierre Dep. at 76-77).  Plaintiff's attempt, known as a "cat's

---

[4] The Court notes Plaintiff fails to establish that Delikat, Franson or St. Pierre knew that Plaintiff requested FMLA forms on June 29, 2011.  Therefore, any retaliation claim predicated on that request fails because Plaintiff cannot establish the second prong - that the employer knew she was exercising a right under the FMLA.

paw" theory of liability is defined as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]."  *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S. Ct. 1186, 1194 (2011) (emphasis in the original) (examining cat's paw theory in regards to a USERRA claim); *see also Cobbins v. Tenn. Dept. of Transp.*, 566 F.3d 582, 587 n. 5 (6th Cir. 2009) (defining "cat's paw" theory in the "employment discrimination context" as referring to "a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse hiring decision, thereby hiding the subordinate's discriminatory intent."); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th Cir. 2008) (in the context of a reverse discrimination claim, explaining "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a "rubber-stamp" or "cat's paw" theory of liability.); *Curry v. Goodwill Indus. of Kentucky, Inc.*, 2013 WL 1411131, * (W.D. Ky. Apr. 8, 2013) (applying a "cat's paw" theory to FMLA retaliation claim to impute knowledge regarding the plaintiff's request for FMLA leave from an supervisor to the decisionmaker who terminated the plaintiff, when the decisionmaker testified he would not have terminated the plaintiff without that supervisor's recommendation for the same.).

Defendant argues Plaintiff cannot establish a *prima facie* case of retaliation because she cannot show that her rheumatoid arthritis was a "serious condition" pursuant to the statute and regulations.  Further, Defendant claims that the lapse of nearly six months between the end of her medical leave and her failure to be hired for the model planner position cannot satisfy the causal connection element of a *prima facie* case of FMLA retaliation.

28

The Court finds that even assuming that Plaintiff suffered a "serious medical condition" pursuant to the FMLA, Plaintiff's claim fails where she cannot show a causal connection between Plaintiff's alleged FMLA-qualifying absence from May 2011 until June 2011 and her failure to be rehired in December 2011.

The Sixth Circuit has "typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Gambill v. Duke Energy Corp*., 456 F. App'x 578, 589 (6th Cir. 2012); *see also Seeger*, 681 F.3d 274, 283 (6th Cir. 2012) (holding that "the nearness in time between Seeger's return from FMLA leave and his termination – three weeks after his reinstatement and less than two months after he first notified CBT of his medical leave – suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge."); *Bryson v. Regis Corp*., 498 F.3d 561, 571 (6th Cir. 2007) (three months was sufficient to show temporal proximity and noting that a plaintiff's burden to establish a prima facie case is not "onerous"; *Singfield v. Akron Metro. Housing Auth*., 389 F.3d 555, 5632 (6th Cir. 2004) (holding that three months is sufficient to find a causal connection); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (finding that a plaintiff could not establish a causal connection based on a four month gap in time between the protected conduct of filing a discrimination claim in a Title VII action and her discharge).

In the instant action, Plaintiff's alleged adverse employment action (her failure to be rehired as a Model Planner) occurred some six months after she took her medical leave which is too attenuated to give rise to a causal connection alone.  Additionally, Plaintiff's argument based on a "cat's paw" theory fails because Delikat's negative reference to Franson was consistent with the historical complaints regarding Plaintiff's absenteeism, poor performance and her working

from home which are set forth in her 2011 Review and supported by client complaints as well as

Delikat and Wicker's testimony.  It is undisputed that this 2011 Review <u>predated</u> Plaintiff's

medical leave in May and June, 2011.

It is true that an employer cannot use the taking or requesting of leave as a basis for a

negative employment action.  *See Arban*, 345 F.3d at 403. However, here, Plaintiff cannot show

that St. Pierre was aware of her medical leave or that Delikat's negative reference was motivated

by her taking a medical leave in 2011.  Therefore, the Court finds Plaintiff has failed to establish

a *prima facie* case of FMLA retaliation.

**C.     Prima facie case for Disability Discrimination pursuant to PWDCRA and ADA**

Pursuant to the ADA, an employer may not "discriminate against a qualified individual

on the basis of disability."  42 U.S.C. § 12112(a); *Keith v. County of Oakland*, 703 F.3d 918, 923

(6th Cir. 2013).  The Sixth Circuit has held that the ADA and the PWDCRA "substantially

mirror" each other.  *Donald*, 667 F.3d at 764.  As a result, "claims under both statutes are

generally analyzed identically."  *Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir.

2011).  As neither Defendant nor Plaintiff attempt to distinguish these claims in their briefing,

the Court will consider the arguments under the ADA and PWDCRA together and only address

the PWDCRA claim separately when the standards differ from the ADA.

To set forth a claim for disability discrimination under the ADA, a plaintiff must

establish that "(1) that she or he is an individual with a disability; (2) who was otherwise

qualified to perform a job's requirements, with or without reasonable accommodation; and (3)

who was discriminated against solely because of the disability."[5] *Talley v. Family Dollar Stores*

---

[5] Plaintiff failed to respond in her briefing or at oral argument to Defendant's arguments
regarding her failure to accommodate claim pursuant to the ADA or the PWDCRA.  Further, it is

*of Ohio*, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008) (citation omitted).  Just as with a claim

asserted pursuant to the FMLA, when a plaintiff "seeks to establish a prima facie case [of

disability discrimination under the ADA] by means of circumstantial evidence, we apply the

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."

*Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 703 (6th Cir. 2008); *see also MacDonald v.

United Parcel Serv*., 430 F. App'x 453, 461 (6th Cir. 2011) (applying *McDonnell Douglas*

burden shifting to a PWDCRA claim).  Therefore, once a plaintiff has established a *prima facie*

case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the

adverse employment action.  *Talley*, 542 F.3d at 1105 (citation omitted).  If the defendant can

establish this, then the burden returns to the plaintiff to show by a preponderance of the evidence

that the proffered explanation is mere pretext for discrimination.  *Id*.

> A disability, as defined by the ADA, means:
>
> (A)  a physical or mental impairment that substantially limits one or more
> major life activities of such individual;
> (B)  a record of such an impairment; or
> (C)  being regarded as having such an impairment ...

42 U.S.C. §  12102(1) (2009).  Similarly, the PWDCRA defines disability as

> [a] determinable physical or mental characteristic of an individual, which may
> result from disease, injury, congenital condition of birth, or functional disorder, if
> the characteristic ... substantially limits 1 or more of the major life activities of
> that individual and is unrelated to the individual's ability to perform the duties of
> a particular job or position ..."

MICH. COMP. LAWS § 37.1103(d)(i)(A).

Defendant does not dispute that Plaintiff is disabled pursuant to the statutes, nor does

---

clear from the record that Plaintiff never requested an accommodation from Defendant during a
relevant time period.  Therefore, the Court finds that Plaintiff has conceded any accommodation
claim.  *See Brown*, 545 F. App'x at 372.

Defendant appear to dispute that it was aware of Plaintiff's disability.  Rather, Defendant argues that Plaintiff fails to show she was qualified for the positions she applied for and that Plaintiff cannot show that she was discriminated against because of her rheumatoid arthritis.

Plaintiff fails to specify in her response brief what adverse employment action she suffered - whether it was the fact her job was outsourced to The Right Thing or the failure for her to be rehired as a Model Planner.  Plaintiff just makes the bald assertion that the other people in her department were redeployed to other positions in the company and she was not.

To the extent Plaintiff is attempting to argue that her job being outsourced to The Right Thing was based on disability discrimination, this claim is without merit.  As explained previously, it is clear from the record that the decision to outsource her position was made prior to her taking any medical leave and prior to Defendant becoming aware of her rheumatoid arthritis.  Moreover, Plaintiff herself testified that her job was not outsourced due to her age or disability.  (Pl.'s Dep. at 184-85).

To the extent Plaintiff asserts that she was not hired for the Model Planner position due to her disability, this claim also fails.  Plaintiff cannot establish a *prima facie* case where Plaintiff has failed to show that St. Pierre (the sole decisionmaker) had any knowledge of Plaintiff's medical conditions or that she took any medical leave of absence.  (*See* St. Pierre Dep. at 76-77).

Additionally, Plaintiff appears to assert (again) a "cat's paw" theory in support of her disability discrimination claims.  To this end, Plaintiff argues that Franson or Delikat possessed discriminatory animus against Plaintiff due to her rheumatoid arthritis or her taking medical leave associated with her condition and that animus must be imputed to St. Pierre.  In *Chattman v. Toho Tenax Amer., Inc*., 686 F.3d 339 (6th Cir. 2012), the Sixth Circuit addressed a cat's paw theory in the context of a racial discrimination case, and explained that historically the Sixth

32

Circuit had recognized that a plaintiff could evidence discrimination by offering evidence of a "causal connection" between the decisionmaker's decision to discipline the plaintiff and the supervisor's discriminatory animus. *Id*. at 350. The Sixth Circuit further explained that the plaintiff "must show that 'by relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice – his cat's paw.'" *Id*. (citation omitted). The Sixth Circuit then quoted the recent Supreme Court decision, *Staub*, in defining cat's paw liability: "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Id*. at 351 (quoting *Staub*, --- U.S. ---- , 131 S. Ct. at 1194).

In this action, there is no dispute that St. Pierre relied solely upon the information from Franson that was gathered directly from Delikat in deciding not to hire Plaintiff for the Model Planner position. Further, there is no dispute that St. Pierre relied upon that information such that he would not have removed Plaintiff from the offer pool but for the information flowing from Delikat through Franson to him. However, Plaintiff has failed to set forth any genuine issues of material fact regarding the intent or animus that can be attributed to Delikat or Franson. Franson testified that he was unaware of Plaintiff's rheumatoid arthritis or her medical leave. (Franson Dep. 84-85). While Delikat's mere knowledge of Plaintiff's condition and knowledge of the fact she took medical leave is not enough to give rise to discriminatory animus especially since Delikat's complaints were consistent with the complaints of Plaintiff's other supervisor, Wicker, other internal customer complaints, and her 2011 Review (all of which predated her medical leave and much of which predated her rheumatoid arthritis diagnosis). Given Plaintiff's inability to evidence any animus on the part of Delikat or Franson, Plaintiff's cat's paw theory

33

and her *prima facie* case fails.

Moreover, even assuming Plaintiff could set forth a *prima facie* case of disability discrimination under the ADA or the PWDCRA, Defendant has offered a legitimate and non-discriminatory reason for not hiring her for the Model Planner position – specifically those same reasons Delikat relayed to Franson and Franson parroted back to St. Pierre: that Plaintiff's performance was poor, she had "behavioral issues" with attendance and often worked from home.

Having established a legitimate reason for its decision not to rehire Plaintiff, the burden shifts back to Plaintiff to show that Defendant's proffered reason is "mere pretext" for discrimination.  Plaintiff can show pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Todd v. RBS Citizens, N.A.*, 483 F. App'x 76, 82 (6th Cir. 2012).  Here, Plaintiff cannot evidence pretext where Delikat's complaints (which originated when he was her client) regarding her performance and absenteeism predated Plaintiff's rheumatoid arthritis diagnosis and her medical leave in 2011.  Further, Delikat's complaints were consistent with Plaintiff's previous supervisor, Wicker, as well as in line with other client or co-workers complaints and summarized in her 2011 Review (which predated her medical leave).

Further, Plaintiff's reliance on Franson's after the fact emails to Kim Topping and Dee Williams in which he states that Delikat told him Plaintiff was laid off due to her performance deficiencies or inexplicably states that Plaintiff was not hired as a Model Planner because she lacked "technical engineering experience" are not persuasive.  Even assuming Franson was lying, this does not create an inference of pretext because St. Pierre testified explicitly that he decided not to hire Plaintiff as a Model Planner because he discovered that she "had some

34

behavior issues as well as consistently wanting to work from home and having her assignments

not get done when needed." (St. Pierre Dep. at 58:17-24, Pl.'s Br., Ex. 26, 12/16/11 Email).  As

articulated above, these reasons are historically consistent and contained in Plaintiff's 2011

Review.

       Therefore, the Court finds that summary judgment on Plaintiff's ADA and PWDCRA

claims is appropriate.

### IV. CONCLUSION

       For these reasons, the Court GRANTS Defendant's Motion for Summary Judgment and

DISMISSES Plaintiff's Complaint WITH PREJUDICE.

SO ORDERED.


s/Paul D. Borman                 
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 16, 2014

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or
party of record herein by electronic means or first class U.S. mail on July 16, 2014.


s/Deborah Tofil                     
Case Manager